## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | 18-CV-____ (___) |
| **Plaintiff,** | |
| v. | **COMPLAINT** |
| **MARK E. BURNS,** | |
| **Defendant.** | **JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission (the "Commission") files this Complaint against defendant Mark E. Burns and alleges as follows:

### SUMMARY

1.     This matter involves defendant Mark E. Burns' scheme to fraudulently manipulate the price of Fitbit, Inc. ("Fitbit") securities by filing false information on the Commission's public database (commonly known as EDGAR) and to profit from the resulting market impact of this false filing by trading the company's securities before and after the false filing.

2.     Burns, acting with Robert W. Murray and possibly others, employed several deceptive techniques to conceal his identity and true location, including using someone else's name to create an email account and disguising the internet protocol ("IP") address used to obtain EDGAR filing credentials and make the false filing to conduct the scheme.  In preparation for the scheme, Burns and Murray researched two prior EDGAR manipulation cases filed by the Commission.

3.      On November 9, 2016, minutes after Burns and Murray each purchased out-of-the-money call options in Fitbit, Murray, Burns, or someone acting with them filed a fake tender offer form on EDGAR in the name of a sham company, ABM Capital LTD ("ABM Capital"). The fake tender offer form falsely stated that ABM Capital had submitted a potential tender offer to the board of Fitbit with a price that represented a substantial premium to Fitbit's stock price at the time. When the false filing became publicly available, Fitbit's share price spiked by over 10 percent.  Burns sold all of his Fitbit options within 15 minutes of the public release of his false filing, realizing illicit profits of $13,008, a gain of over 350%.

4.      By engaging in the conduct described in this Complaint, defendant Burns violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)], and Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-8 thereunder [17 C.F.R. § 240.14e-8].

## JURISDICTION AND VENUE

5.      The Commission brings this action pursuant to Sections 20(b) and 20(d)(1) of the Securities Act [15 U.S.C. §§ 77t(b) and (d)(1)], and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] to enjoin such acts, practices, and courses of business, and to obtain disgorgement, prejudgment interest, civil money penalties, and such other and further relief as the Court may deem just and appropriate.

6.      This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa].

7.      Venue in this District is proper because certain of the acts, practices, transactions, and courses of business constituting the violations alleged herein occurred within the Southern District of New York.  Defendant manipulated the market for securities listed on the New York Stock Exchange ("NYSE") which is located in Manhattan.

## DEFENDANT

8.      **Mark E. Burns,** age 30, is a resident of Norfolk, Virginia.  During the relevant time period, Burns worked as a senior marine engineer at an engineering, technical, and software services company located in Virginia Beach, Virginia.

## OTHER RELEVANT PERSON

9.      **Robert W. Murray,** age 25, is currently incarcerated in Morgantown, West Virginia.  During the relevant time period, Murray resided in Chesapeake, Virginia and worked as a mechanical engineer at an engineering, technical, and software services company located in Virginia Beach, Virginia.

## THE RELEVANT ISSUER

10.     **Fitbit** is a Delaware corporation, headquartered in San Francisco, California. Fitbit makes and sells wearable fitness and health technology, and its stock is traded on the NYSE under the ticker symbol "FIT."

## TERMS USED IN THIS COMPLAINT

### EDGAR

11.     The Electronic Data Gathering, Analysis, and Retrieval system, commonly referred to as "EDGAR," is the Commission's system for accepting and publicly releasing submissions from companies and others who file documents with the Commission.

12.     EDGAR's primary purpose is to increase the efficiency and fairness of the securities market by providing universal public access to time-sensitive corporate information

filed with the agency.  EDGAR is a crucial source of information for the investing public about securities trading in the United States.

13.      In order to be able to file documents through EDGAR, a filer must complete a Form ID, which is an electronic application to obtain EDGAR access codes.  As part of the application process, each applicant must provide the applicant's name, contact information, and other information and must have the form authenticated by a notary.

### Schedule TO-C and Schedule 13D

14.      One type of document filed on EDGAR is a "Schedule TO-C."  A Schedule TO-C is used to report a written communication relating to an issuer or third party involving a tender offer.  The filing of a Schedule TO-C can have a substantial impact, causing the company's stock price to rise in anticipation of a potential tender offer.

15.      A "Schedule 13D" is another type of document filed on EDGAR.  A person or group that acquires beneficial ownership of more than 5% of a voting class of a company's stock usually is required to file a Schedule 13D, reporting the acquisition of the interest and the purpose of the acquisition.

### Call Options

16.      A call option is a contract that entitles the buyer to purchase a security under specified terms.  The buyer of a call option has the right, but not the obligation, to buy the agreed-upon security at a set price (the "strike price") on or before the expiration date for that option.

17.      Generally, the holder of a call option benefits when the price of the underlying security rises.  For example, when the market price of the security exceeds the strike price of the call option, the holder of the option can exercise the option and collect the difference between the strike price and the market price, or sell the option in the market for a premium.  In addition,

4

even if the market price does not exceed the strike price, an increase in the price of the underlying security can still cause the value of the option contract to increase. In that case, the holder of the option can sell the option contract in the market for a profit compared to the price paid for it.

18.     An "out-of-the-money" call option is a call option with a strike price that is higher than the market price of the underlying asset.

## FACTS

19.     Burns conspired with his colleague, Robert Murray, to execute the fraud. Acting together, Burns and Murray obtained access to EDGAR under false pretenses, purchased risky, out-of-the-money call options in Fitbit, filed false information relating to Fitbit on EDGAR which caused the price of Fitbit securities to spike, and then sold their Fitbit options at artificially-inflated prices.

### Burns and Murray Obtained Access to EDGAR Under False Pretenses

20.     Burns and Murray concealed their identities and actual location in the state of Virginia by, directly or indirectly, using an IP address that is registered to a company located in Napa, California (the "California IP Address"), thereby making it appear as though someone else was accessing EDGAR (and other websites) from a different state. Email accounts featuring the names of other persons were also created and used to perpetrate the scheme.

21.     On or about November 2, 2016, Murray sent Burns an instant message with a link to a web page, "Filings & Forms," on the EDGAR section of the Commission's website.

22.     On November 2, 2016, Murray, Burns, or someone working with them used an IP address registered to Murray and Burns' employer in Virginia (the "Office IP Address") to view information on the Commission website concerning how to file a Form ID with EDGAR.

23.     On November 4, 2016, using the California IP Address, Murray, Burns, or someone working with them, visited the website of a Pennsylvania company ("Company 1") with an office in Shanghai, China and viewed the "contact" page for Company 1.  Minutes later, using the name of an executive listed on the "leadership" page of Company 1's website ("Executive 1"), Murray created a new email account through a free email service (the "Alias Email Address").

24.     On November 8, 2016, Murray, Burns, or someone working with them, used the California IP Address to submit a Form ID in the name ABM Capital—a sham company—to obtain login credentials to make EDGAR filings.

25.     The Form ID contained several misrepresentations.  The Form ID falsely listed Executive 1 as the CFO of ABM Capital and falsely indicated that Executive 1 had signed the Form ID.  The Form ID listed the Alias Email Address and the address of Company 1's Shanghai office as the address for ABM Capital.  The Form ID contained a falsified notary stamp, with a fake notary name and number.

26.     Later that day, EDGAR issued login credentials for ABM Capital and sent an email to the Alias Email Address with a link to the account.

### Burns and Murray Prepared to Execute and Capitalize on Their Scheme

27.     Burns and Murray, acting alone or with others, conducted detailed online research to prepare the false tender offer, beginning with studying two prior Commission cases involving individuals who made false EDGAR filings to manipulate securities prices:  SEC v. PTG Capital Partners Ltd, et al., 1:15-cv-04290-LAK (filed June 4, 2015, S.D.N.Y.) (the "Nedev Case") and SEC v. Aly, 1:16-cv-03853-PGG-GWG (filed May 24, 2016, S.D.N.Y.) (the "Aly Case").

28.     In the Nedev Case, filed in 2015, the Commission filed a civil action against Nedko Nedev and affiliated entities, alleging that Nedev submitted two false Schedule TO-C

6

filings, announcing fake tender offers to manipulate the price of securities in two separate companies.

29.     In the Aly Case, filed in 2016, the Commission alleged that Nauman Aly filed a false Schedule 13D filing on EDGAR, announcing a proposed offer to acquire all outstanding shares of a publicly-traded company.  As alleged in the complaint, by purchasing options immediately before the false filing and selling them a few minutes after the false news of a potential takeover hit the market, Aly was able to make over $420,000 in profit in less than half an hour.

30.     The complaints filed in the Nedev Case and the Aly Case highlight the IP addresses that those individuals used to submit false filings on EDGAR.

31.     In early November 2016, Murray, Burns, or someone acting with them, used the Office IP Address to review news articles and other materials relating to the Nedev Case and the Aly Case.

32.     On the evening of November 8, 2016, and the following morning, using the California IP Address, Murray, Burns, or someone acting with them conducted additional research regarding the form and mechanics for the scheme, including:  research into the various ways to commence a tender offer; review of example schedules and forms filed on EDGAR; review of a Google book, "EDGAR Filer Handbook:  A Guide for Electronic Filing With the SEC;" and research into Fitbit's CUSIP number and the value of Fitbit's common stock. Murray, Burns, or someone acting with them also practiced filing documents on EDGAR, loading a blank Schedule TO-C and uploading and deleting attachments.

33.     On November 9, 2016, at approximately 11:16 a.m. Eastern Time,[1] using the

Office IP Address, Murray purchased out-of-the-money call options for Fitbit stock.  Murray

purchased options for a total of 14,900 shares of Fitbit stock with strike prices of $8.50 and $9.00

per share.  Murray spent $887 to purchase the options, which expired just two days later, on

November 11, 2016.  At the time, Fitbit stock was trading at approximately $8.46.

34.     Less than ten minutes later, at approximately 11:23 a.m. on November 9, 2016,

using the same Office IP Address, Burns purchased the same series of Fitbit call options.  Burns

purchased out-of-the-money call options for a total of 40,000 shares of Fitbit stock with strike

prices of $8.50 and $9.00 per share.  Burns spent $3,640 to purchase the options, which also

expired on November 11, 2016.

35.     Neither Murray nor Burns had previously traded Fitbit securities in their

brokerage accounts.

**Burns and Murray Implemented Their Scheme,**
**Manipulating the Market for Fitbit Securities**

36.     On November 9, 2016, at approximately 11:27 a.m.—only a few minutes after

Murray and Burns purchased the Fitbit call options—Murray, Burns, or someone working with

them logged into the ABM Capital EDGAR account using the California IP Address.

37.     On November 9, 2016 at 11:39 a.m., Murray, Burns, or someone working with

them, attempted to file a Schedule TO-C on EDGAR relating to Fitbit.  The 11:39 a.m.

submission was immediately rejected by EDGAR because it contained an incorrect identification

number for Fitbit.

38.     On November 9, 2016 at 11:44 a.m., Murray, Burns, or someone working with

them filed a corrected Schedule TO-C on EDGAR relating to Fitbit (the "False Schedule TO-

---

[1] All times alleged herein are in Eastern Time.

C"). The False Schedule TO-C stated that ABM Capital had submitted a letter to the board of directors of Fitbit, proposing to acquire all outstanding Class A common shares of Fitbit at a price of $12.50 per share. The False Schedule TO-C stated that it related to "preliminary communications made before the commencement of a potential tender offer" by ABM Capital. The False Schedule TO-C listed Executive 1 as the CFO of ABM Capital and used Company 1's Shanghai office address as the address of ABM Capital. The False Schedule TO-C was also purportedly signed by Executive 1. The False Schedule TO-C was filed using the California IP Address.

39.     The False Schedule TO-C contained material misrepresentations. Contrary to the representation in the False Schedule TO-C, neither Murray, nor Burns, nor Executive 1, nor ABM Capital had submitted an offer to Fitbit's board of directors proposing to acquire all outstanding Class A common shares of Fitbit.

40.     The False Schedule TO-C became publicly available through EDGAR's website on November 10, 2016 at approximately 10:59 a.m. Immediately before the filing became public, Fitbit traded at $8.41 per share. As news outlets reported the purported tender offer, Fitbit's stock price immediately spiked, rising to a high at 11:10 a.m. of approximately $9.28 per share, an increase of more than 10%. After hitting this peak, the price of Fitbit stock dropped, closing at a price of $8.86 per share at the end of the trading day.

41.     Later in the day on November 10, 2016, Fitbit issued a press release announcing that Fitbit had not received any communication from ABM Capital, or any other firm, regarding a reported tender offer.

**Burns and Murray Profited from Their Manipulation of Fitbit's Stock Price**

42.     Minutes after the False Schedule TO-C became public, Murray, who had logged in to his brokerage account using the Office IP Address, began selling the Fitbit call options that he had purchased the day before.

43.     On November 10, 2016, between approximately 11:10 a.m. and 11:13 a.m., Murray sold all of his Fitbit options, realizing a profit of approximately $3,118—a 351% gain in less than 24 hours.

44.     At approximately the same time, using the Office IP Address, Burns sold all of his Fitbit call options.  Burns realized a profit of approximately $13,008—a 357% gain in less than 24 hours.

45.     If the price of Fitbit stock had climbed to the purported tender offer price in the false filing of $12.50 per share and Burns had been able to sell the options based on that price, his illicit profits would have been approximately $147,800.

**Murray Pled Guilty to Securities Fraud**

46.     On May 9, 2017, Murray was arrested in the Eastern District of Virginia in connection with the conduct described herein.

47.     On July 18, 2017, a Grand Jury in the Southern District of New York indicted Murray for securities fraud and wire fraud.

48.     On November 7, 2017, Murray pled guilty to one count of securities fraud based on the manipulation of Fitbit securities described herein.

**Burns' and Murray's Conduct Caused Harm to The United States Markets**

49.     Burns' and Murray's conduct caused direct and substantial harm to the United States securities markets and investors.  On the day that the False Schedule TO-C became

publicly available, 25.19 million shares of Fitbit were traded—a 77% increase over the prior day's volume of 14.22 million shares. Investors who purchased Fitbit shares or options shortly after the false filing, either because of the filing or for other reasons, paid artificially inflated prices for those securities.

50.     Burns' and Murray's conduct also caused more general harm to the United States markets and investors. The Commission's EDGAR system promotes efficient and fair markets by providing prompt universal access to information about thousands of corporations. The filing of false documents on the Commission's EDGAR system threatens to undermine investor confidence and negatively impact the efficiency and fairness that EDGAR promotes.

### Burns Violated the Federal Securities Laws

51.     In connection with the false filings described herein, Burns made use of the means or instruments of interstate transportation or communication in interstate commerce or of the mails, and Burns made use of a facility of a national securities exchange.

52.     The Fitbit options that Burns purchased and sold in November 2016 are securities, and the misrepresentations and other fraudulent conduct described herein were in connection with the purchase or sale, and in the offer or sale, of securities.

53.     All of the misrepresentations and omissions set forth herein, individually and in the aggregate, are material. There is a substantial likelihood that a reasonable investor would consider the misrepresented facts and omitted information—including, among other items, about the true status of ABM Capital and the purported tender offer by ABM Capital for Fitbit stock— important in deciding whether or not to purchase Fitbit securities.

54.     By means of untrue statements of material fact, Burns obtained money or property from the sale of Fitbit options.

55.     By conspiring with Murray to gain access to EDGAR through false pretenses, manipulate the market for Fitbit stock and options through fraudulent EDGAR filings, and sell his Fitbit position at artificially inflated prices, Burns employed a device, scheme or artifice to defraud, and engaged in a transaction, practice, or course of business which operated as a fraud or deceit upon the purchasers of securities.

56.     The false filings described herein were made for the purpose of manipulating the price of Fitbit securities, not to report a genuine potential tender offer to acquire all outstanding shares of Fitbit.  Burns had no intention of actually commencing a tender offer within a reasonable time, and Burns had no intention of completing any tender offer.  Burns did not reasonably believe that he, Murray, or the fake company, ABM Capital, would have the means to purchase the shares in Fitbit needed to complete a tender offer.

57.     At all times relevant to this complaint, Burns acted knowingly and/or recklessly. Burns knew, or was reckless in not knowing, of the scheme to manipulate the price of Fitbit securities and of the specific acts done to further the scheme, whether done by Burns, Murray or someone working with them, and Burns benefitted from the scheme and the acts done in furtherance of it.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act

58.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1- 57 inclusive, as if they were fully set forth herein.

59.     Defendant Burns, directly or indirectly, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, in the offer or sale of securities, knowingly or recklessly:

(1) employed devices, schemes, or artifices to defraud;

(2) obtained money or property by means of untrue statements of material facts, or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(3) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchasers of securities offered or sold.

60.     By reason of the foregoing, defendant Burns violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Thereunder**

61.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1- 57 inclusive, as if they were fully set forth herein.

62.     Defendant Burns, directly or indirectly, by use of the means or instruments of interstate commerce or of the mails, or the facility of national securities exchanges, in connection with the purchase or sale of securities, knowingly or recklessly:

(a) employed devices, schemes, or artifices to defraud;

and

(c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

63.     By reason of the foregoing, defendant Burns violated and, unless enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a) and (c) [17 C.F.R.§ 240.10b-5], thereunder.

## THIRD CLAIM FOR RELIEF

### Violations of Section 14(e) of the Exchange Act and Rule 14e-8 Thereunder

64.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1- 57 inclusive, as if they were fully set forth herein.

65.     Defendant Burns has made an untrue statement of material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or engaged in fraudulent, deceptive, or manipulative acts or practices in connection with a tender offer or a solicitation of security holders in favor of an offer, request, or invitation.

66.     In November 2016, defendant Burns acted with one or more others to publicly announce that ABM Capital planned to make a tender offer that had not yet been commenced, and defendant Burns:

(a) made the announcement of a potential tender offer without the intention to commence the offer within a reasonable time and complete the offer;

(b) intended, directly or indirectly, for the announcement to manipulate the market price of the stock of the subject company; and/or

(c) did not have the reasonable belief that defendant (or Murray, Executive 1, or ABM Capital) would have the means to purchase securities to complete the offer.

67.     By reason of the foregoing, defendant Burns violated and, unless enjoined, will continue to violate, Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-8 [17 C.F.R. § 240.14e-8], thereunder.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a final judgment:

### I.

Permanently restraining and enjoining defendant from, directly or indirectly, violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-8 thereunder [17 C.F.R. § 240.14e-8];

### II.

Ordering defendant to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint, together with prejudgment interest thereon;

### III.

Ordering defendant to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)]; and

**IV.**

Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

Respectfully submitted,

Date:   July 11, 2018

Julia C. Green
Jennifer C. Barry*
Assunta Vivolo
David W. Snyder*
U.S. Securities and Exchange Commission
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA  19103
(267) 602-2133 (Green)
greenju@sec.gov

*Not admitted in the S.D.N.Y.

**Of Counsel**
Robert A. Cohen
Joseph G. Sansone